IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| EARTHBOUND CORPORATION, a Washington corporation; and INTACT STRUCTURAL SUPPLY, LLC, a Washington corporation,<br><br>            Plaintiffs,<br><br>      v.<br><br>MITEK USA, INC., a Missouri corporation, *et al.*,<br><br>            Defendants. | Case No. C16-1150 RSM<br><br><br>ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER AND FOR EXPEDITED DISCOVERY, AND SCHEDULING HEARING FOR PRELIMINARY INJUNCTION |

## I.  INTRODUCTION

This matter comes before the Court on Plaintiffs' Motion for Temporary Restraining Order ("TRO"), Order to Show Cause and Order Expediting Discovery.  Dkt. #17.  Plaintiffs request that the Court grant a TRO requiring Defendants to return all of Plaintiff Earthbound Corporation's ("Earthbound") property and information in their possession, custody or control and enjoin Defendants from soliciting or servicing customers of Earthbound for any purpose pending a determination of the scope of the information misappropriated from Earthbound and its use.  *Id.* at 3.  Plaintiffs also seek an order requiring Defendants to show cause why a preliminary injunction should not be issued similarly restraining defendants

ORDER– 1

during the pendency of this action. *Id.* Finally, Plaintiffs request that the Court permit them to take expedited discovery prior to the preliminary injunction hearing. *Id.* For the reasons discussed herein, the Court GRANTS the Motion and sets a preliminary injunction hearing.

## II. BACKGROUND

Plaintiff Earthbound manufactures products and provides services and systems for earthquake tie-down and connections in building construction. Dkts. #22 at ¶ 2 and #20 at ¶ 2. Plaintiff Intact Structural Supply, Inc. ("ISS") markets and sells Earthbound products, services, and systems. *Id.* Defendant Ken Keyse served as ISS's Regional Sales Manager; Defendant James Miller was its Product Representative; and Defendant Jason Birdwell was its Product Service Representative. Dkts. #22 at ¶ 3 and #30 at ¶ 3. Together the three were the entirety of ISS's sales team. *Id.* According to Plaintiffs, they held positions of trust and confidence. *Id.*

As Regional Sales Manager, Mr. Keyse had access to Earthbound's bids, designs, and engineering information. Dkt. #22 at ¶ 4. Mr. Keyse also had access to Earthbound's "Super-Template,

> that includes client names, contracted and pending projects, and pricing on projects . . . The Super-Template contains "Earthbound's DNA," representing a culmination of over twenty years of design, refinement and testing. It contains our engineering calculations on load pressures, deflection and elongation, design methodology, product selection, inventory, and pricing. After performing a takeoff of the project specifications (pulling the specifications from the design documents), the Super-Template can create data and assigns and tracks locations for the product in the design, based on pre-loaded data and formulas that are built in to the Super-Template. We use the same logic and design for each project via the Super-Template. With a copy of only one electronic job spreadsheet from the Super-Template, an engineer could reverse-engineer our designs and create a competitive business. It is a base prototype and numerical model of a patented online design tool, and the only such tool in our industry.

ORDER– 2

Dkts. #20 at ¶ 4 and #31 at ¶¶ 9-13.

Earthbound's President explains that the Super-Template "is a priceless trade secret." Dkt. #20 at ¶ 5. He further explains that the "Super-Template is not an off-the-shelf product. It is not a mere database storing historical information. It is a unique tool. We did not pay for it nor purchase the data that it contains; we built it from the ground-up." *Id.* Further, "[i]f a copy of a job spreadsheet was made, a MiTek engineer would have no problem in replicating Earthbound designs with the Super-Template. A MiTek engineer would know how we set up and price jobs." *Id.* Mr. Keyse asserts that he was never told that the Super-Template was a trade secret, confidential or proprietary, or that he should not share it with anyone. Dkt. #31 at ¶¶ 15-16.

Mr. Keyse also had access to Earthbound's financial goals, strategic planning, and sales projections. Dkt. #22 at ¶ 4. Mr. Keyse and Mr. Miller deny that they have any of this information in their possession. Dkts. #31 at ¶ 30 and #29 at ¶ 18.

Earthbound asserts that it takes reasonable efforts to maintain the secrecy of its information, including training, limiting access to certain users only for their sales territory, and password protection. Dkt. #22 at ¶ 5. To access the Super-Template, employees must have user credentials and a password. Mr. Keyse was the only employee in the ISS office with access to the Super-Template. *Id.* Earthbound asserts that Mr. Keyse was directed not to copy or change any information in the computer systems and was expected to ensure that Mr. Miller and Mr. Birdwell also complied with those restrictions. Dkts. #22 at ¶ 5 and #20 at ¶ 7. Mr. Keyse does not deny that assertion. *See* Dkt. #31.

ORDER– 3

1
2
3
4

However, none of the individual Defendants signed any form of confidentiality agreement or non-disclosure agreement regarding the Super-Template or ISS's business operations.  Dkts. # 31 at ¶ 17, #29 at ¶ 9 and #30 at ¶ 9.

5
6
7
8
9

Earthbound is a privately-held company, and has only two competitors providing similar products and services in the California market, one of which is Defendant MiTek. Dkts. #22 at ¶ 2 and #20 at ¶ 2.  The products and services Earthbound sold through ISS in California have represented a large percentage of Earthbound's total business. *Id.*

10
11
12
13
14
15
16
17
18
19

In 2007 and again in 2014, MiTek entered into negotiations to purchase Earthbound. Dkts. #22 at ¶ 8 and #20 at ¶ 10.  In each instance the parties entered into a non-disclosure agreement ("NDA") that protected trade secrets and other confidential and proprietary business information.  *Id.*  Relying on the NDAs, Earthbound shared information regarding its profit and loss, customers, projects, and key personnel – specifically Mr. Keyse and Mr. Miller, and how they could contribute in the relevant market.  *Id.*  Earthbound ultimately rejected MiTek's offer in 2015.  *Id.*

20
21
22
23
24
25

On June 13, 2016, Mr. Keyse, Mr. Miller, and Mr. Birdwell each gave notice of their resignation and disclosed that they were leaving for MiTek.  Dkts. #22 at ¶ 9 and #20 at ¶ 11. Mr. Keyse and Mr. Miller offered to remain at Earthbound for two weeks to answer customer emails and calls, but they wanted to simultaneously be placed on MiTek's payroll.  *Id.* Earthbound declined their offer.  *Id.*

26
27
28
29
30

After the resignations, Earthbound took steps to cut off the departing employees' access to the company server and email, and rerouted their cell phones with new SIM cards to ensure that customer calls were being handled.  Dkt. #22 at ¶ 9.  Mr. Keyse returned his company laptop and cell phone, and Mr. Birdwell returned his cell phone, on June 24, 2016.

ORDER– 4

Dkts. #22 at ¶ 10, #20 at ¶ 12 and #21 at ¶ 4.  Mr Keyse had deleted all documents from his laptop and deleted files from his cell phone.  Mr. Keyse admits that he inserted four thumb drives into his laptop, but that it was for the sole purpose of removing personal information he had on his computer.  Dkt. #31 at 34.  Mr. Birdwell had factory reset his cell phone so that there was no data on his phone.  Mr. Birdwell does not deny this.  *See* Dkt. #30.  Upon checking the departing employees' email on the company's server, Earthbound discovered that Mr. Miller had forwarded work-related emails to his wife's email address.  Dkts. #22 at ¶ ¶ 10-12 and #20 at ¶ ¶ 12-15.  Mr. Miller admits that he forwarded work-related emails to his wife's email account, but asserts this was so he could access them at home on his wife's desk top computer "because I did not know how to print documents from my laptop."  Dkt. #29 at ¶ 24.  Mr. Miller also factory reset his cell phone, deleting all data.  Dkt. #18 at ¶ 31. He does not deny this.  *See* Dkt. #29.

As a result, Earthbound retained a forensic expert, Allison Goodman of E-Discovery, to investigate the individual Defendants' access and use of the company's electronic devices and systems.  Dkt. #18 at ¶ 3.

According to Ms. Goodman, to date, she has discovered the following:

    a. Communications with MiTek and two former Earthbound employees, Ken Keyse and James Miller, started as early as March 2016 and Ken Keyse received a check from MiTek on April 11, 2016.

    b. Ken Keyse and James Miller received employment documents from MiTek at least by May 9, 2016;

    c. Mr. Keyse signed the MiTek employment documents by May 31, 2016 and appears to have received a signing bonus.

ORDER– 5

d. Mr. Keyse accessed an unusually large number of files from Earthbound's server a few days before providing his resignation on June 13, 2016.

e. Within a few weeks before his resignation Mr. Keyse accessed 23 files created by Earthbound known as their Super-Template. This was the first time all year Mr. Keyse had never (sic) accessed this type of file.

f. On the same day that Mr. Keyse accessed the server files, at least one USB drive was connected to Mr. Keyse's computer and Mr. Keyse accessed his Dropbox account.

g. Mr. Keyse attempted to access Earthbound's network after he resigned.

h. It appears that Mr. Keyse installed an application called OneDrive on the computer he used to access the Earthbound server on May 25, 2016. OneDrive is a cloud storage option provided by Microsoft that allows a person to drag and drop files to an online storage site.

i. Mr. Keyse had a Samsung Galaxy Note cell phone provided by Earthbound that he began using in June 2014. He obtained a new Samsung cell phone on June 4, 2016.

j. Mr. Keyse installed an application called Smart Switch on his Earthbound Samsung Galaxy Note on June 8, 2016. This application is designed to transfer all content from your current device to a new Samsung device. This application can transfer most items, including contacts, messages and documents. Mr. Keyse had over 700 files on his Earthbound cell phone and many appear to be Earthbound documents.

k. Mr. Keyse had a Google Drive and Google Photos account and he accessed Earthbound documents from the Google Photos account in June 2016 after he had resigned.

l. Mr. Keyse has a Dropbox account set up with his Earthbound email address of ken@holdown.com. Even though Mr. Keyse's Earthbound email **account** is no longer accessible by him (he can't send or receive email with this email address) he can still access **documents** within this Dropbox account that are sent to his Earthbound email address because his email address is simply the account identification for the Dropbox account. There are numerous Earthbound related documents within that Dropbox account.

ORDER– 6

m. On July 15, 2016 a current Earthbound customer requested pricing for a new project via the ken@holddown.com Dropbox account. That customer request was accessed by Mr. Keyse on July 18, 2016, more than a month after he had resigned.

n. On June 13, 2016 (the day he submitted his resignation) Mr. Miller received a request for pricing to his James@Holddown.com email account via Dropbox. He forwarded this email to his wife's email address the following day, June 14, 2016.

o. Jason Birdwell received an email entitled "text messages" on June 14, 2016. The email was deleted and all we could recover was the subject line and date. A few minutes later Mr. Birdwell received an email from AT&T resetting his voicemail password. After these events Mr. Birdwell returned his Earthbound issued cell phone, which had been factory reset and no data was recoverable.

Dkt. #18 at ¶ 4a-o (bold in original).

In addition, Ms. Goodman has provided extensive date demonstrating text messages and other communication between the individuals and MiTek, while they remained employed by Earthbound.   Dkt. #18 at ¶ ¶ 518 and Exs. 2-4 thereto.   Ms. Goodman concluded:

19. . . . Mr. Keyse began discussions with MiTek as early as March 2016; completed an employment application for MiTek by May 12, 2016; agreed to a signing bonus by June 3, 2016; established his first day of employment with MiTek by June 8, 2016; and drafted his resignation letter by June 9, 2016.

20. Attached as Exhibit 5 is a spreadsheet that identifies access to files on Earthbound's server by the Ken Keyse's user profile. In order to access Earthbound's server, Mr. Keyse and Mr. Miller logged into a remote desktop and from that machine they could access the server drives. Exhibit 5 identifies the files that were accessed from within the "Ken" user profile on that remote desktop computer for all of 2016. These are also link files, but they are created on the remote desktop computer Mr. Keyse logged into when he accessed Earthbound's server. All of the link files identified on Exhibit 5 are within the "Ken" user profile on this remote desktop computer.

ORDER– 7

21. The number and type of files accessed from the Earthbound server changed significantly between January and June 2016. In January and February 2016, only five files were accessed by the "Ken" user profile from the Earthbound server – three in January and two in February. In March, nine files were accessed, but only two of them on the same day. In April, fourteen files were accessed and four of them were on the same day (April 7, 2016). There were 21 files accessed in the month of May, and six of them were accessed on May 27, 2016 between 7:02 pm and 8:06 pm. (Exhibit 5).

22. From June 1 to June 10, 2016, the "Ken" user profile accessed 75 files and directories from Earthbound's server. Over half were accessed on June 9, 2016, the same day that Ken Keyse drafted his resignation letter. The files and directories that were accessed were primarily within folders entitled **_Pricing_** and **_Pending_**. Another 10 files were accessed from the server the following day, June 10, 2016, including a file entitled **CustomerLists.xls**. (Exhibit 5).

23. Earthbound has created a proprietary Excel template (referred to as "the Super-Template") that takes information from the plans provided by the prospective customer to identify the number of components for each job, which then determines pricing. I have viewed some of the job folder spreadsheets created with the Super-Template, which can contain as many as 20 different worksheets within each spreadsheet. Each separate worksheet contains embedded formulas that rely on data within the other worksheets. These worksheets have a file extension of _.xlsb_.

24. Exhibit 5 contains no evidence that the "Ken" user profile accessed any Excel files with this file extension prior to May 20, 2016. But from May 20, 2016 through June 9, 2016, the "Ken" user profile accessed 23 of these proprietary Excel template files. I have highlighted the files with the .xlsb file extension on Exhibit 5, in addition to the CustomerLists.xls file that was accessed on June 10, 2016.

Dkt. #18 at ¶ ¶ 19-24 and Ex. 5 thereto (bold in original).

In addition, Ms. Goodman discovered:

26. Exhibits 4 and 5 identify the Earthbound files that were accessed and Exhibit 6 is a spreadsheet identifying USB drives that were plugged into the computers used by Mr. Keyse and Mr. Birdwell. The operating system on the Keyse laptop was Windows 7 Ultimate, installed on May 17, 2014, and the "Ken" user profile was created

ORDER– 8

on August 22, 2014. The operating system on Mr. Birdwell's laptop was created on December 9, 2015 and his user profile was created the same day.

27. The drive letters identified on Exhibit 6 indicate that Mr. Keyse had more than one USB drive plugged into his laptop at the same time. Drive letters are assigned to devices in alphabetical order and the first drive letter is typically "C". There are two partitions on this laptop, which means the second partition would be drive letter D. We can see that a generic USB flash memory device was plugged in for the first time on July 20, 2015 and last connected on June 24, 2016, and it was assigned drive letter E. Another generic flash drive was last connected on June 17, 2016 and assigned drive letter F and a third was last connected in February 2015 and assigned drive letter G. This indicates that when the USB drive that was assigned drive letter G was plugged into the Keyse's laptop, there were already two other devices plugged into this computer.

28. The Windows operating system does not specifically identify each time a USB drive is plugged into a computer. This information is captured from a number of different locations within the system and typically will only identify the first and last times a USB drive was connected but sometimes not even that much, as is evidenced by the USB drive that was plugged into Mr. Birdwell's laptop. Mr. Birdwell did not appear to use his Earthbound laptop on a regular basis. There were many days of zero activity, particularly during the months of April and May 2016. But there is no way to determine what files may have been copied to the USB drives without imaging and analyzing the USB drives.

29. **Jason Birdwell's Cell Phone**. Mr. Birdwell was assigned a Samsung cell phone that he used for Earthbound work. The emails within Mr. Birdwell's account indicate that a large number of them were sent from his cell phone. The numerous days of absolutely no activity within the Earthbound laptop assigned to Mr. Birdwell indicates that a large portion of Mr. Birdwell's work was done on his cell phone.

30. A portion of an email was recovered from Mr. Birdwell's email account with the subject line "Text Messages". Attached as Exhibit 7 is a PDF rendering of this recovered email along with the metadata associated with the email. The metadata indicates the email was sent to Jason Birdwell on June 14, 2016 at 4:34 pm with a subject line of Text Messages, but no other information regarding this email has been recovered. A few minutes later an email was sent to Mr.

ORDER– 9

Birdwell's Earthbound email address from AT&T advising that a temporary password was set for his voicemail. Attached as Exhibit 13 is a copy of that email. It is my understanding that Mr. Birdwell's Earthbound Samsung cell phone was factory reset before it was returned to Earthbound. A factory reset means that the phone will look as though it did when it was originally purchased and needs to be entirely configured again for a new user. This device would have had an Android 5.0 or above operating system which would not allow for the recovery of data after a factory reset. However data could still exist on any backups or smart cards contained within the device.

31. **Mr. Miller's Cell Phone**. Mr. Miller was also assigned a Samsung cell phone by Earthbound which had been factory reset before it was returned to Earthbound and no information was available from this device. Again, data could have been backed up and/or transferred to a new device.

32. **Mr. Keyse's Cell Phone**. Attached as Exhibit 8 is a list of files that were on Mr. Keyse's Earthbound-provided cell phone. The entries shaded in gray represent deleted files.

33. Mr. Keyse purchased a new Samsung cell phone on June 4, 2016. . .

34. He also installed an application called Samsung Smart Switch on June 8, 2016 which is designed to move data from one device to another. . . .

35. Exhibit 9 identifies all of the data that can be transferred with the Smart Switch application, which includes contacts, text messages and documents.  This means that Mr. Keyse could have easily transferred all of the Earthbound files identified on Exhibit 8 to his new phone.  There is evidence that the Smart Switch application was used on the Earthbound phone, but no way to determine what data was transferred without imaging and analyzing the phone to which the data was transferred.

36. **Gmail, Google Drive, and Google Photos**.  On June 3, 2016, Mr. Keyse established a Gmail account with the email address of jkeyse60@gmail.com. . . .

37. After establishing a Gmail address, Mr. Keyse began using Google Photos.  Google Photos is a subset of Google Drive which offers free online storage for 15 GB of data. . . .

ORDER– 10

38. Exhibit 10 identifies thumbnail images of over 100 files that existed in Mr. Keyse's Google Photos account.  These images were found within a cache folder on Mr. Keyse's Earthbound cell phone and were created between June 6 and June 16, 2016.  Many of these images appear to be related to Mr. Keyse's Earthbound employment and were viewed after he resigned on June 13, 2016.

39. There are also many additional Earthbound related files that exist in a Google Drive account that was established with the ken@holdown.com email address.  Attached as Exhibit 14 is a spreadsheet identifying 1675 files from a Google Drive database file on Mr. Keyse's Earthbound cell phone.  Even though this Google Drive account is set up with Mr. Keyse's Earthbound email address, it is not available to anybody else within Earthbound.  Mr. Keyse's email address is simply the user name to access the Google Drive account.

40. As identified above, it appears that Mr. Keyse has two Google Drive accounts.  One established with his ken@holdown.com email account and another with his jkkeyse60@gmail.com account.  Most of the files identified on Exhibit 10 are images or pictures that exist within one or both of his Google Drive accounts.  The file names identified on Exhibit 14 are documents that exist within one or both of his Google Drive accounts.  Exhibit 8 identifies files that either currently exist or previously existed on Mr. Keyse's cell phone which could have been uploaded to one or both of the Google Drive accounts and these files could also have been transferred to his new cell phone. The only way to determine what Earthbound data exists in both of Mr. Keyse's Google Drive accounts is to download the data and review the account history.

Dkt. #18 at ¶¶ 26-40 and exhibits thereto.

Ms. Goodman also discovered evidence that Mr. Keyse attempted to access an Earthbound database after his resignation, and that he accessed project files through his DropBox account.  Dkt. #18 at ¶¶ 41-43 and 48-55 and exhibits thereto.  Mr. Keyse admits that he attempted to access the Earthbound server, but states that this was because he wanted to "see if [he] had been locked out."  Dkt. #31 at ¶ 39.  Ms. Goodman also discovered

ORDER– 11

evidence that Mr. Miller had forwarded email from his DropBox account to his wife's email account the day after he resigned. *Id.* at ¶ 56 and Ex. 16 thereto.

On July 15, 2016, Earthbound's counsel sent cease-and-desist letters to MiTek and the individual defendants, asking that they return the thumb drives used by Mr. Keyse, provide access to all storage devices used by the individual defendants so that Earthbound's information could be removed, and asking MiTek to withdraw from any project on which the individual defendants had provided input. Dkt. #19 at Exs. 1 and 2. After sending the letters, Earthbound learned from a customer that the customer had received an unsolicited bid from MiTek for a project that the customer said it had been planning to award to ISS. Dkt. #21 at ¶ 5. MiTek's new bid was lower than ISS's bid. *Id.* Mr. Keyse, Mr. Miller, and Mr. Birdwell were aware of the project, which ISS had bid before their departure. *Id.*

Further attempts by Earthbound to obtain information and documents from Defendants have remained unfruitful. As a result, Plaintiffs filed the instant motion. Plaintiffs argue that if the individual Defendants continue to work on bids and projects using Earthbound's information, have contact with Earthbound's customers for any reason, or otherwise share Earthbound's information with MiTek, they may succeed in destroying Earthbound's goodwill with its clients and thus its economic viability. Dkt. #17 at 9-10. Plaintiffs further argue that Earthbound invested significantly to build up the California market and to hire employees and designate resources to support it. Dkt. #21 at ¶ 7. Plaintiffs assert that if the individual Defendants are not immediately enjoined, and if MiTek is not ordered to return Earthbound's data and allow Earthbound to conduct expedited discovery, ISS will likely close its doors and Earthbound may never recover. Dkt. #17 at 10.

### III.  DISCUSSION

ORDER– 12

A federal court may issue a TRO "with or without written or oral notice to the adverse party" only if "specific facts in the affidavit . . . clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and the moving party "certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b). "Motions for temporary restraining orders without notice to and an opportunity to be heard by the adverse party are disfavored and will rarely be granted." Local Rules W.D. Wash. LCR 65(b). It appears that Plaintiff has provided Defendants with notice of her motion. Dkt. #85-2.

The Ninth Circuit has described the standards for deciding whether to grant a motion for a preliminary injunction:

> To obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. These formulations are not different tests but represent two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Under either formulation, the moving party must demonstrate a significant threat of irreparable injury, irrespective of the magnitude of the injury.

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 868 F.2d 1085, 1088 (9th Cir. 1989) (citations omitted). The speculative risk of a possible injury is not enough; the threatened harm must be imminent. *Caribbean Marine Services Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); Fed. R. Civ. Proc. 65(b)(1)(A). The standards for issuing a TRO are similar to those required for a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F.Supp. 1320, 1323 (N.D. Ca. 1995).

**A.  Personal Jurisdiction**

ORDER– 13

As an initial matter, Defendants argue that this Court should not address the instant motion, and should instead dismiss the Complaint, because the Court lacks personal jurisdiction over the individual Defendants. Dkt. #33 at 10-12. The Court is not persuaded.

Federal Rule of Civil Procedure 12(b)(2) governs the dismissal of an action based on lack of personal jurisdiction. Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004). A plaintiff cannot simply rest on the bare allegations of his Complaint, but rather is obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction. *Amba Marketing Systems, Inc. v. Jobar International, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977). Where, as here, the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional facts. *Schwarzenegger,* at 800. Uncontroverted factual allegations must be taken as true. Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. *Id.* A *prima facie* showing means that the plaintiff has produced admissible evidence, which if believed, is sufficient to establish the existence of personal jurisdiction. *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir. 1995).

Where no applicable federal statute addresses the issue, a court's personal jurisdiction analysis begins with the "long-arm" statute of the state in which the court sits. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir. 2002). Washington's long-arm statute extends the court's personal jurisdiction to the broadest reach that the United States Constitution permits. *Byron Nelson Co. v. Orchard Management Corp.* 95 Wn.App. 462, 465, 975 P.2d 555 (1999). Because Washington's

ORDER– 14

long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analysis under state law and federal due process are the same. *Schwarzenegger,* at 800-01.

The Due Process Clause protects a defendant's liberty interest in not being subject to the binding judgments of a forum with which it has established no meaningful contacts, ties or relations. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). In determining whether a defendant had minimum contacts with the forum state such that the exercise of jurisdiction over the defendant would not offend the Due Process Clause, courts focus on the relationship among the defendant, the forum, and the litigation. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977).

Personal jurisdiction exists in two forms, general and specific. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002). General jurisdiction exists over a non-resident defendant when there is "continuous and systematic general business contacts that approximate physical presence in the forum state." *Schwarzenegger,* at 801. In the absence of general jurisdiction, the court may still exercise specific jurisdiction over a non-resident defendant. To establish specific jurisdiction, the plaintiff must show that: (1) defendant purposefully availed itself of the privilege of conducting activities in Washington, thereby invoking the benefits and protections of its laws; (2) plaintiff's claims arise out of defendant's Washington-related activities; and (3) the exercise of jurisdiction would be reasonable. *Easter v. American West Financial,* 381 F.3d 948, 960-61 (9th Cir. 2004); *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1086 (9th Cir. 2000).

    *1.   General Jurisdiction*

ORDER– 15

A defendant is subject to general jurisdiction only where the defendant's contacts with a forum are "substantial" or "continuous and systematic." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir. 2000).  Plaintiffs assert that specific jurisdiction is present in this case.

2.  *Specific Jurisdiction*

As noted above, in the Ninth Circuit, specific jurisdiction is analyzed using a three-part test: First, the nonresident defendant must have purposefully directed his activities or consummated some transaction with the forum or a forum resident, or performed some act by which he purposefully availed himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; second, the claim must be one which arises out of or relates to the nonresident defendant's forum-related activities; and third, the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable.  If the plaintiff is successful at establishing the first two prongs, the burden shifts to the defendant to set forth a compelling case that the exercise of jurisdiction would not be reasonable.

Here Defendants "set aside" the first two prongs of the test, and focus only on reasonableness.  Dkt. #33 at 12.  Typically, to determine reasonableness, the Court examines seven factors: existence of an alternative forum; burden on the defendant; convenience and effectiveness of relief for the plaintiff; most efficient judicial resolution of the dispute; conflict with sovereignty of the defendants' state; extent of purposeful interjection; and the forum state's interest in the suit. *Brand v. Menlove Dodge,* 796 F. 2d 1070, 1075 (9th Cir. 1986).  Defendants do not address these prongs.  Instead they argue in summary fashion, that they have had few contacts with the State of Washington, they live

ORDER– 16

and work in the State of California, and that the most efficient judicial resolution of the matter would be in California.  *See* Dkt. #33 at 12.  On this record, Defendants fail to set forth a compelling case that the exercise of jurisdiction would not be reasonable. Accordingly, this Court concludes that specific jurisdiction exists.

**B.  Request for TRO**

Defendants next argue that Plaintiffs fail to establish that they are entitled to a TRO. Dkt. #33 at 13-24.  Again, the Court disagrees.  For the reasons set forth in Plaintiffs' opening brief, along with those set forth in its Reply, and on a review of the forensic evidence presented by Ms. Goodman, this Court agrees that a TRO should issue.  Serious questions have been raised as to whether the individual Defendants misappropriated trade secrets and other confidential information, and whether they did so at the direction or with the acquiescence of Defendant MiTek, and the balance of hardship tips in Plaintiffs' favor.

*1.  Likelihood of Success on the Merits*

In this motion, Earthbound focuses on just tthree of their claims against Defendants to support their request for injunctive relief – breach of duty of loyalty and misappropriation of trade secrets.  Dkts. #17 at 12-14.  Plaintiffs rely on Washington law for the state claims, and federal law for the federal trade secret claim.  Defendants, without waiving a later argument that California law may apply to some of Plaintiffs' claims, does not dispute the application of Washington law to the state claims in this motion.  Dkt. #33 at 13-14.

a. Breach of Duty of Loyalty

Under Washington law, regardless of the existence of a written contract of employment, employees owe their employer a duty of loyalty.  This duty prohibits employees from acting in direct competition with their employer, for example, by soliciting

customers for a rival business. *Kieburtz & Assocs. v. Rehn*, 68 Wn. App. 260, 265-66 (1992).

Similarly, as agents of their employer, employees have a duty to use the employer's property

solely for the employer's benefit. *Moon v. Phipps*, 67 Wn.2d 948, 954-55 (1966).  In this

case, the Court finds that the evidence currently before it demonstrates that while still

employed by Earthbound, the individual Defendants established relationships with MiTek, a

competing business, that involved paid trips to St. Louis during their Earthbound-

compensated work hours and payment of bonuses by MiTek.  Ms. Goodman's analysis and

conclusions also provides strong circumstantial evidence that the individual Defendants

shared Earthbound's confidential information with a primary competitor.    Moreover,

individual Defendants apparently referred at least a few Earthbound clients to MiTek.  Dkts.

#20 at ¶ 13 and Ex. 2 and #19 at ¶ 9, Ex. 12.  In addition, the record contains evidence that

Mr. Keyse ceased forwarding customers' emails, sales reports, and other necessary

information, and that all of the individual Defendants deleted information from Earthbound's

server and data-storage devices.  Dkts. #20 at ¶ ¶ 13-14, #21 at ¶ 7 and #18 at ¶ ¶ 44-50.

These actions, among others, demonstrate a likelihood of success on the merits of the duty of

loyalty claim.

>           b. Misappropriation of Trade Secrets

Plaintiffs have asserted claims for misappropriation of trade secrets under both

Washington State and federal law.    Under Washington's Uniform Trade Secrets Act

("UTSA"), RCW 19.108, et seq., "[a]ctual or threatened misappropriation may be enjoined."

RCW 19.108.020(1). The terms "trade secret" and "misappropriation" are defined under the

UTSA.    RCW 19.108.010(2).    Federal and state courts have found that customized

compilations of data, which may come from both public and private sources, constitute trade

ORDER– 18

secrets. *United States v. Nosal*, __ F.3d __ (9th Cir. 2016) (involving a database of potential executives compiled and used by search company); *MAI Systems Corp. v Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1992) (finding that a manufacturer's customer database that allows a competitor to direct its sales efforts to particular customers qualifies as trade secret). "A trade secrets plaintiff need not prove that every element of an information compilation is unavailable elsewhere." *Boeing Co. v. Sierracin Corp.*, 108 Wn.2d 38, 50 (1987).  Trade secret protection for a customer list does not depend on whether the list is taken in written form or memorized.  *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wn.2d 427, 449 (1999).

In this case, for the reasons discussed by Plaintiffs, the Court agrees that detailed information about Earthbound's current and prospective customers, pending projects, bids, pricing, product design, and other elements of its business constitute trade secrets under the UTSA.  *See* Dkt. #17 at 14-15.  The Court also finds that on the record before it, there is strong circumstantial evidence that Defendants misappropriated the trade secrets in question. *See* Dkts. #19 at ¶ 14, Ex. 16 and #18 at ¶ ¶ 19-23, 25, 27, 30, 31, 37-39 and 51.

The same evidence demonstrates a likelihood of success on the merits on Plaintiffs' claim for violation of the Economic Espionage Act, as amended by the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq. ("EEA").  As amended, the EEA authorizes private civil actions by owners of trade secrets that have been misappropriated, where the trade secret is related to a product or service used in, or intended for use in, interstate commerce.  18 U.S.C. § 1836(b).  The EEA defines trade secrets similarly to but even more broadly than the UTSA. 18 U.S.C. § 1839(3). Under the EEA, the Court may grant an injunction to prevent actual or threatened misappropriation of trade secrets. 18 U.S.C. §1836(b)(3); RCW 19.108.020.

2.  *Irreparable Harm*

ORDER– 19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

Plaintiffs argue that they will suffer irreparable harm if an injunction does not issue. Dkt. #17 at 17-18.  The Court agrees.  They have presented evidence that Defendants have already won a project the client intended to award to Earthbound by using Earthbound's information to underbid it. The evidence further indicates that MiTek has been involved in this activity prior to the date of the individual Defendants' resignations.  Dkt. #20 at ¶ 13, Ex. 2.  Interestingly, Defendants do not deny taking the information at issue, but rather argue that they did not know such information was confidential or proprietary, that they currently do not have such information in their possession, and MiTek told them not to take any confidential information with them when they left Earthbound.  *See* Dkts. #29, #30 and #31. However, without a clear picture of what was taken and what may still be in Defendants' possession and/or control, Plaintiffs are unable to take effective steps to protect themselves. The Court also agrees that monetary damages for the loss of specific projects will be insufficient to repair the harm under these circumstances.  Accordingly, the Court finds that Plaintiffs have demonstrated irreparable harm if an injunction does not issue.

*3. Balance of Equities*

Defendants assert that a TRO would "impose an enormous burden" on its operations in California.  Dkt. #33 at 22.  However, they do not provide any support for such a statement.  Moreover, they discuss at length why the information at issue in this case would not be pertinent to their business.  *Id.* at 4-6.  Further, MiTek has already focused Mr. Keyse and Mr. Miller on products not competing with those of Plaintiffs.  Dkt. #28 at ¶ 22.  For these, and all of the reasons discussed above, the Court finds that the balance of equities tips in favor of Plaintiffs.

*4. Public Interest*

ORDER– 20

The Court agrees with Plaintiffs that a TRO in this matter would be in the public interest.  The EEA establishes criminal penalties for misappropriation of trade secrets. 18 U.S.C. § 1832.  This demonstrates Congress's belief that such conduct is harmful not only to the individual or entity whose secrets are purloined, but also to the public. Theft of trade secrets, and allowing the thieves to retain and use the confidential information they purloined, undermines business development and stability; preventing such conduct is in the public's interest.  That injunctive relief is generally appropriate when trade secrets have been misappropriated is acknowledged by the inclusion of specific provisions for such relief in both the EEA and the UTSA.

As a result, Plaintiffs have established that they are entitled to a TRO in this matter.

*5.  Bond*

Plaintiffs ask for a nominal bond should a TRO issue in this matter.  Defendants ask for a bond of $200,000.  No evidence has been presented to the Court that Defendants will suffer any loss of income should a TRO issue.  Accordingly, the Court finds that a nominal bond is appropriate.

**C.  Expedited Discovery**

Plaintiffs also seek an Order allowing expedited discovery so that they can determine the full extent of Defendants' unlawful actions and establish Earthbound's right to a preliminary injunction.  Dkt. #17 at 20-23.  Defendants do not respond to the request, and appear to acknowledge that "some form of expedited discovery" would be necessary.  Dkt. #33 at 23.  Accordingly, the Court grants Plaintiffs' request.

**IV. CONCLUSION**

ORDER– 21

Having reviewed Plaintiffs' motion, Defendants' opposition, the Declarations and Exhibits in support thereof, and the remainder of the record, the Court hereby finds and ORDERS:

1. Plaintiffs' Motion for TRO (Dkt. #17) is GRANTED.

2. Defendants shall immediately deliver to a neutral third-party expert in the greater Seattle area all flash drives, SD cards, cell phones, and other external drives used by the individual defendants and by Thomas Mort since February 2016 that are in Defendants' possession, custody, or control. Counsel shall cooperate to select a mutually acceptable neutral. The third-party expert shall be instructed to create a forensic image at Defendants' expense of all such devices and to provide a written report of their contents (without disclosing any proprietary information), but should not allow either party to view the image(s) absent mutual written agreement of the parties or order of the Court.

3. Defendant Keyse shall immediately provide the passwords to the OneDrive and Dropbox accounts created during his employment with Earthbound. Defendant Keyse shall not access the Dropbox account or OneDrive account again absent written agreement of the parties or order of the Court. Earthbound's forensic expert may access these accounts in a manner that preserves the original contents, and may take steps to capture forensic evidence of the accounts. Earthbound's forensic expert may also change the account password so that it is no longer accessible to Defendant Keyse.

4. Defendant Keyes shall immediately provide Earthbound with the login and password credentials to access the Google Drive and Google Photos accounts

created during his employment with Earthbound.  Earthbound's forensic expert may access these accounts in a manner that preserves the original contents, and may take steps to capture forensic evidence of the accounts.  Earthbound's forensic expert may access these accounts in a manner that preserves the original contents, and may take steps to capture forensic evidence of the accounts.  Earthbound's forensic expert may also change the account password so that it is no longer accessible to Defendant Keyse.

5.  Defendant Keyes shall immediately identify any other cloud-based storage account that he has used at any time between February 2016 through the present and provide login and password credentials to the third-party expert.  The third-party expert shall provide counsel for the parties with a report on the contents of the cloud-based storage accounts.

6.  Defendant Keyse shall not take any action to delete, destroy, or move any data in any cloud-based storage account, and shall not direct or permit anyone to do so on his behalf.

7.  Defendants Birdwell and Miller shall immediately identify any cloud-based storage account that they have used at any time between February 2016 through the present and provide login and password credentials to the third-party expert.  The third-party expert shall provide counsel for the parties with a report on the contents of the cloud-based storage accounts.

8.  Defendants Birdwell and Miller shall not take any action to delete, destroy, or move any data in any cloud-based storage account, and shall not direct or permit anyone to do so on their behalf.

ORDER– 23

9. Thomas Mort shall not take any action to delete, destroy, or move any data in any cloud-based storage account, or destroy any documents, that relate to Earthbound's allegations in this matter, and shall not direct or permit anyone to do so on his behalf.

10. MiTek shall preserve all data and documents that relate to Earthbound's allegations in this matter.

11. Defendants must respond to the written discovery requests attached as Exhibit 17 to the Declaration of Jeffrey A. James within fourtenn (14) days of the date of this Order.

12. Mr. Keyse, Mr. Miller, Mr. Birdwell, and Mr. Mort shall appear for deposition at the offices of Earthbound's counsel on September 13th and/or 14th, unless otherwise agreed to by Earthbound, to be deposed for not more than two hours each. These depositions shall not count toward the depositions allowed under F.R.C.P. 30.

13. Defendants are restrained from using in any manner any confidential or proprietary information or trade secrets of Earthbound, including Earthbound's Super-Template, customer and project lists and information, pricing information, vendor information, information regarding bids for projects, and any other information that would not be known to Defendants if the individual Defendants had not been employed by Earthbound.

14. Defendants, both counsel and their clients, shall appear for a preliminary injunction hearing on September 28, 2016 at 9:30 a.m. to show cause why the requirements and restraints of this Order should not be continued pending trial on the merits.

ORDER– 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

15. Earthbound shall post a bond in the amount of $1,000.00.

DATED this 19th day of August 2016.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER– 25